## Sterling R. Fulmore v. W. P. Lane, Comptroller.

### No. 2332. Decided November 4, November 22, 1911.

### 1.—Legislation—Governor—Veto Power.

The veto power of the Governor in general and especially over items of an appropriation bill considered and defined. (Pp. 509-512.)

### 2.—Same—Appropriations—Separate Items—Case Stated.

The Governor having power to veto one or more items of an appropriation bill, but not to reduce or veto in part any distinct item (Const., art. 4, sec. 14, 15) and the Legislature having appropriated the sum of $83,160 for the support of the Attorney-General's Department of the State Government for two years, assigning one half of such sum to each year, with restrictions as to the purposes for and manner in which such sum should be expended (General Appropriation Bill, Act of Aug. 30, 1911, Laws, 3d Leg., Second Called Session, p. 17) which portion of the Bill was disapproved by the Governor, the same being signed by him after striking out the appropriation of $83,160 for the two years, and the sum of $41,580 for the year ending on August 31, 1913, and also the directions and restrictions as to how the entire sum of $83,160 should be expended, leaving the sum of $41,580 under the head of appropriations for the year ending Aug. 31, 1912; it is held;

(1) Such veto did not have the effect of invalidating the entire appropriation for the two years.

(2) The appropriations of $41,580 for each of the two years were separate items, within the meaning of the constitutional provision granting and defining the veto power of the Governor; he had the right to disapprove the appropriation for one year without affecting that for the other, and his veto had that effect. (Mr. Justice Ramsey dissents on this point, holding the entire appropriation for two years, in the form in which same is here made, to constitute a single item within the meaning of the Constitution, which could not be disapproved in part and was not disapproved in its entirety, and that the approval of the bill without disapproving the whole of this item had the effect of enacting such appropriation as a whole.)

(3) The question whether any part of the appropriation for the first year remaining unexpended at its close would be available for the support of the department for the ensuing year, is not involved in this case and is not here determined.

(4) The action of the Governor in striking out the part of the Bill regulating the purposes for and manner in which the appropriation should be expended, was without effect, his power being limited to approving or disapproving the Bill as a whole, or approving it with the exception of certain items of the appropriation objected to by him.

(5) There being a lawful appropriation for the support of the department for the year ending Aug. 31, 1912, an employee thereof (a stenographer) whose claim for services within that time was presented by proper voucher was entitled to writ of mandamus requiring the Comptroller to issue warrant for its payment, he having no right to refuse to issue the warrant if there was a valid appropriation.

(6) The effect of the veto upon the entire appropriation for the support of the department being a question not free from doubt, the Comptroller will not be taxed with costs of the proceeding to determine the relator's right to his warrant. (Pp. 500-538.)

Original application by Fulmore to the Supreme Court for writ of mandamus against Lane as State Comptroller.

*John W. Brady* and *E. P. Robertson,* for relator.

*W. P. Lane,* respondent, in pro. per.

*Jerrel P. Lightfoot,* Attorney-General, by permission, filed argument as amicus curiae.

*H. M. Garwood,* by permission, filed argument as amicus curiae, in support of the validity of the veto.

MR. JUSTICE DIBRELL delivered the following opinion.

This is an action by Sterling R. Fulmore, relator, against W. P. Lane, State Comptroller, respondent, upon a petition for a writ of mandamus to compel the respondent, as Comptroller of the State, to issue his warrant to the State Treasurer, in favor of relator for the sum of $100, alleged to be due him by the State for salary for services performed during the month of September, 1911, as stenographic clerk in the office of the Attorney-General.

No issue of fact is made by the pleadings, and the questions presented are those of law exclusively.

If an appropriation was made by the First Called Session of the Thirty-First Legislature for the support and maintenance of the Attorney-General's department, and such appropriation was not vetoed by the Governor, as contended for by the respondent, then the relator is entitled to his writ of mandamus, compelling the respondent, as Comptroller of Public Accounts, of this State, to issue his warrant to the State Treasurer, for the amount of salary due relator.

Section 14, chapter 17 of the Acts of Third Called Session of the Thirty-First Legislature, 1910, Session Acts, page 39, is as follows:

"Section 14. No warrant shall be drawn on the Treasury of this State by the Comptroller based alone on the requisition of any individual or board, except as otherwise provided by law, but in all cases an account must first be made in pursuance of some specific appropriation, and filed with the Comptroller, by some one duly authorized and verified by affidavit."

The duties of the Comptroller under the above section of the Act of the Third Called Session of the Thirty-First Legislature are essentially different from those under section 13 of said Act, as recently held by this court in the case of Jewel P. Lightfoot, relator, v. W. P. Lane, respondent.

Under the several provisions of said Act the Comptroller of Public Accounts is required to audit and approve or disapprove all claims against the State, and by the provisions of section 14, as above quoted, where such claims are based alone on the requisition of any individual, which is here construed to mean any person authorized by law to make such requisition, or board, the Comptroller is not authorized to draw his warrant on the Treasury of the State, unless such claim is made in pursuance of some specific appropriation. Under such circumstances his duty is not merely ministerial, but discretionary in the degree that he is authorized to withhold the issuance of his warrant until he ascertains whether such claim is made in pursuance of some specific appropriation. It should not, however, be implied that by the use of the word *discretionary* above the court holds that under the provision of section 14, of said Act, the Comptroller is clothed with absolute or arbitrary power to withhold the issuance of his warrant, but that be-

fore he is required to issue same under the provisions of said section 14 he must determine for himself whether the claim is or not made in pursuance of a specific appropriation. If no such appropriation has been made as a basis for the claim, the Comptroller is not required to issue the warrant, but on the other hand, if such appropriation has been made and the requisition for the warrant is made in pursuance thereof his duty to issue the warrant is mandatory and he can not lawfully withhold the issuance of the warrant.

Respondent's answer filed in this case does not disclose any reason why he refused to issue relator a warrant for his salary, which was due him for the month of September, 1911, but we find in the sixteenth paragraph of respondent's petition an allegation, in substance, that respondent refused to issue such warrant upon the sole ground as stated by him, that the appropriation made by the First Called Session of the Thirty-Second Legislature for the support of the Attorney-General's department had been vetoed in whole by the Governor, and that there was no legal appropriation available against which the Comptroller was authorized by law to draw his warrant. While the respondent contends that the entire appropriation for the Attorney-General's department was vetoed by the Governor, the relator contends that no part of such appropriation has been vetoed. That the appropriation for this department was made in a single item, and that no authority was given the Governor by the Constitution to veto a part of an item, and that in attempting to veto a part of an item the veto message was ineffectual and void as to all of said appropriation. These constitute the main questions for decision by this court and we proceed to their determination.

On the 26th day of August, 1911, at its First Called Session, the Thirty-Second Legislature of this State passed and sent to the Governor for his approval the General Appropriation Bill, carrying the grand total sum of $10,208,613.85, divided into two sums of $5,558,621.85 for the year ending August 31, 1912, and $4,649,992.00 for the year ending August 31, 1913, and making specific appropriations for the maintenance of the General Government and all of its departments, charitable institutions, etc.

The enacting clause of the bill is in words and figures as follows:

"An Act making appropriations for the support of the State Government for two years beginning September 1, 1911, and ending August 31, 1913, and for other purposes, and prescribing certain regulations and restrictions in respect thereto; to make additional appropriations for the support of the State Government for the year ending August 31, 1911, and to pay various miscellaneous claims against the State, and declaring an emergency."

The first section of the bill making the appropriation for the support of the Government is as follows:

"BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

"Section 1. That the following sums of money, or so much thereof as may be necessary, be, and the same are hereby appropriated, out of any money in the State Treasury not otherwise appropriated, for the

support of the State Government from September 1, 1911, to August 31, 1913, and for other purposes, and for additional amounts to support the State Government for the year ending August 31, 1911, and to pay deficiencies enumerated herein, created according to law prior to August 31, 1911; provided that each and every employee of each and every institution or department of this State shall be paid by voucher issued in his or her name; said voucher should state the amount of salary or sum due, and for what service performed with the date and time of said service, and no money or moneys shall be paid except upon presentation of said voucher or vouchers endorsed by the payee; provided, further, that all of said vouchers upon which any money or moneys have been paid shall be filed with the Comptroller for the inspection of the Governor and the Legislature or by their authority; and provided further, that the correct account shall be kept for all sums paid, or obligations outstanding against each item of appropriation herein and weekly statements of the net balances to the credit of each account, after all payments made and obligations outstanding have been deducted, shall be forwarded to the State Comptroller, and it shall be unlawful for the State Purchasing Agent or the authority in charge of any institution or department of this State to purchase or issue orders for any supplies or to otherwise pledge the credit of this State beyond the amount herein appropriated or otherwise lawfully authorized."

Immediately following section 1 of the bill and on the right margin of the bill will be found the following words, which are carried through the entire bill and preceding the appropriation of each department:

"For the years ending
Aug. 31, 1912 Aug. 31, 1913."

Following section 1 of the bill which makes the appropriation, come in consecutive order, the Executive Office, Mansion and Grounds, Department of State, State Revenue Agent, Public Buildings and Grounds, Department of Insurance & Banking, Texas Library and Historical Commission, State Tax Board, State Purchasing Agent, Public Printing, Bureau of Labor Statistics, State Inspector of Masonary, Public Buildings and Works, Adjutant General's Department, Texas State Board of Health, Game, Fish & Oyster Commissioner, Live Stock Sanitary Commission, State Mining Board, and Pure Food Commission, for all of which subjects and departments large appropriations are made without any repetition of the appropriating language found in section 1 of the bill, until the next succeeding department is reached, which is the Attorney-General's department. The words "for the years ending August 31, 1912, August 31, 1913," are carried forward and repeated at the beginning of the appropriation for each subject and department.

In making the appropriation for the Attorney-General's department will be found the language and arrangement as follows:

## "ATTORNEY-GENERAL'S DEPARTMENT.

"For the years ending
"Aug. 31, 1912  Aug. 31, 1913

"For the support and maintenance of the Attorney-General's Department, including postage, stationery, telegrams, telephones, furniture, repairs, express, typewriters and fittings, contingent expenses, costs in civil cases in which the State of Texas or any head of a department is a party; for the actual traveling expenses and hotel bills incurred by the Attorney-General or any of his assistants or employees in giving attention to the business of the State elsewhere than in the city of Austin; for depositions and procuring evidence and documents to be used in civil suits or contemplated suits wherein the State is a party; for law books and periodicals; for the payment of any and all expenses incident to and connected with the administration of the duties of the Attorney-General's office; for the enforcement of any and all laws, wherein such duty devolves upon the Attorney-General; for the payment of any and all expenses in bringing, prosecuting and defending suits; for the payment of the salary and maximum fees provided by the Constitution for the Attorney-General, and for the payment of the salaries and compensation of his assistants and employees and other help deemed by the Attorney-General to be necessary to carry on the work of the Attorney-General's Department, there is hereby appropriated the sum of Eighty-Three Thousand and One Hundred and Sixty ($83,160.00) Dollars, to be expended during the two fiscal years ending August 31, 1912, and August 31, 1913, to be paid by the Treasurer on warrants drawn by the Comptroller upon vouchers approved by the Attorney-General,.          $41,580.00          $41,580.00

"For the guidance of the Attorney-General in the expendiure of such sums out of the above item of appropriation of $83,160.00, as may be necessary to properly conduct the business of his department, he is hereby empowered and authorized to employ such regular assistants as he may deem necessary, not to exceed seven in number at any one time, one of such assistants he shall designate as First Office Assistant Attorney-General; and there may be expended out of the above item of appropriation a sum not exceeding $20,000 per annum for the purpose

of paying the salary of the Attorney-General at $2,000 per annum and such fees as are prescribed by law, not to exceed $2,000 per annum, and for the purpose of paying the salaries of the assistants employed; provided that no assistant shall receive more salary than $2,500 per annum; and the Attorney-General shall have the power and authority to employ such stenographic clerks as he may deem necessary to carry on the work of the department, not to exceed four in number, one of whom shall be chief clerk and bookkeeper; and there may be expended out of the above item of appropriation a sum not to exceed $4,900 per annum to pay the salaries of such stenographic clerks, provided that no stenographic clerk shall receive more than $1,300 per annum; there may be employed one porter who shall be paid out of the above item of appropriation a salary of $480 per annum; there may be expended out of the above item of appropriation, for postage, stationery, telegrams, telephones, furniture, repairs, express, typewriters, and fittings, and contingent expenses so much thereof as may be necessary, not to exceed the sum of $1,350 per annum. The remainder of the above item of appropriation, or so much thereof as may be deemed necessary by the Attorney-General, shall be expended for costs in civil cases in which the State of Texas or any head of a department is a party; for the actual traveling expenses and hotel bills incurred by the Attorney-General, or any of his assistants or employees, in giving attention to the business of the State elsewhere than in the city of Austin; for depositions and procuring evidence and documents to be used in civil suits, or contemplated suits, wherein the State is a party; for law books, and periodicals; and for the enforcement of any and all laws of the State of Texas wherein that duty devolves upon the Attorney-General, and for the payment of any and all expenses deemed necessary by the Attorney-General in the prosecution and defense of all suits, and particularly for the enforcement of the anti-trust and corporation laws and for the employment of special and other help when the same may be deemed necessary by the Attorney-General, provided that the head of said department shall keep a record of the absences of the various employees and the reasons therefor, whether from sickness, vacation or on leave of absence, and that the record of such absence be incorporated in the report made biennially by the head of said department; provided, that the amount herein appropriated as stated herein, and no more, shall be paid out of the general revenue for the Attorney-General's department during the fiscal years beginning September 1, 1911, and ending August 31, 1913, and provided further, that no deficiency shall be created, nor shall any warrants be issued nor obligations incurred in excess of the amounts herein appropriated."

Upon receipt of the appropriation bill embracing the appropriation for the Attorney-General's department by the Governor, on the following day and while the Legislature was still in session, he sent to the Senate and House of Representatives his veto message and filed with the Secretary of State the appropriation bill with a statement of his objections appended thereto, as provided by the Constitution. To understand the effect of the veto message on the appropriation under investigation it will be necessary to set out in full said message and statement, which are as follows:

"Executive Office, Austin, Texas, Aug. 29, 1911.
"To the Senate and House of Representatives:

". . . I regret exceedingly the necessity for having to veto any portion of the appropriation for the executive departments of the State Government. I regret that the Legislature felt it incumbent upon itself to seek to deprive the Governor of the constitutional prerogative of vetoing any item for any department where in his judgment such appropriation was excessive or unnecessary. In the bill as filed with the Secretary of State I have exercised this prerogative, nevertheless, and vetoed the lump sum of $83,160.00 appropriated to the Attorney-General's department. After making this lump appropriation in one item, the Legislature divided the same into two items of $41,580.00 each for the fiscal years ending August 31, 1912 and 1913, respectively. By striking out the lump appropriation and the words describing the same, and the appropriation of $41,580.00 for the second year, the sum of $41,580.00 is left subject to the use of the Attorney-General for the maintenance of his department for the two fiscal years named, any portion of which can be used, under the language of the bill, for any purpose in carrying on the duties of his office. This is not as much, perhaps, as should be appropriated to this department. I have no desire to cripple its efficiency, but under all the circumstances I felt impelled to take the course I have in this instance. If further means are needed to carry on the work of said department, as shown in the statement filed with the Secretary of State, I shall be glad to approve application for necessary deficiency warrants to meet all necessary expenses of that department.

"I find by reference to the appropriation for this department by the Thirty-First Legislature that the sum of $34,830.00 was appropriated for the fiscal year ending August 31, 1910, and $24,330.00 for the fiscal year ending August 31, 1911, or a total of $59,160.00 for the two years. Of this amount about $11,902.00 has lapsed or will lapse, showing that the total requirements of that department for the last two years, with an increased force of assistants, was $47,258.00. In view of these facts, the sum of $83,160.00 for the two years ending August 31, 1913, was deemed by me to be excessive, and should not have been asked for, especially in view of the unsatisfactory condition of the finances of the State at this time.

"On account of the manner in which the appropriation was made, no other course was left open to me than to veto the bulk sum of $83,160.00 and the item of $41,580.00 for the second year. Even under present conditions and taking the expenditures for the last two fiscal years as a basis, it will not require more than $6,000.00 or $7,000.00 deficiency to meet the requirements of the Attorney-General's office up to the 31st day of August, 1913. The sum which remains in the bill subject to the Attorney-General's unconditional control, as seems to have been the wish and will of the Legislature, will be amply sufficient, even upon the present expensive basis under which that department is conducted, to last him until the next Legislature meets in January, 1913, without even a deficiency. The paragraph containing the items which follow the appropriations for the respective years named is vetoed, because it is out of harmony with the remainder of

the appropriation after the objections already noted and the items named were disapproved."

"Executive Office, Austin, Texas, Aug. 29, 1911.
"To the Secretary of State:

"As provided in section 14 of article 4 of the Constitution of Texas, I transmit herewith for file in the office of the Secretary of State, free conference committee substitute for Senate Bill No. 3, said Bill being 'An Act making appropriations for the support of the State Government for two years beginning September 1, 1911, and ending August 31, 1913, and for other purposes, and prescribing certain regulations and instructions in respect thereto, to make additional appropriation for the support of the State government for the year ending August 31, 1911, and to pay various miscellaneous claims against the State, and declaring an emergency,' said Bill having passed the First Called Session of the Thirty-Second Legislature of the State of Texas, and having been received in the Governor's office on August 26, 1911, at 6:30 p. m.

"Said free conference committee substitute for Senate Bill No. 3 has been signed by me on this date, and the items therein not objected to are approved. I append to the said bill at the time of signing the same this statement, showing the items to which I object, and the reasons therefor. Where the items objected to have no special reason assigned for that action, they are vetoed on the ground that the appropriations are not essential to the efficient administration of the State Government or of the particular department for which they may have been made. I have run a blue pencil through said items objected to, as well as the words describing them, as follows; except where the appropriation covers a period of two years and that for only one year is vetoed:

". .                                    Attorney-General's Department.

"(1) On page 30, the item in words as follows, 'the sum of Eighty-Three Thousand and One Hundred and Sixty ($83,160.00) Dollars,' is objected to and disapproved, first, because it is an excessive appropriation of the public funds for the purposes appropriated at a time when the burden of taxation upon the people of this State must necessarily be increased to supply deficits and pay the necessary expenses of government; second, because the same is an evasion of the Constitution, in that it is an attempt to make an appropriation in gross and not for specific purposes as directed by the Constitution.

"(2) The item on page 30 of $41,580.00 for the fiscal year ending August 31, 1913, is objected to and disapproved. The remaining item of $41,580.00, as appropriated, is available for use until exhausted, and may be applied during both of the fiscal years ending August 31, 1912, and August 31, 1913. If said sum of $41,580.00 is not sufficient for both of said years any additional amount actually needed for the efficient administration of the Attorney-General's office can be provided by deficiency allowance when the same is ascertained to be necessary.

"(3) The following language, beginning on page 30 and concluding on page 34, is objected to and disapproved for the reason that it is

not in harmony with the appropriation for the Attorney-General's department in consonance with the objections to the two items already elimited as outlined above." Here follows the guidance clause in the appropriation for this department, which has heretofore been copied in this opinion and it will not be necessary to repeat it here.

The Constitution of this State, section 14, article 4, in part, provides: "If any bill presented to the Governor contains several items of appropriation, he may object to one or more of such items, and approve the other portion of the bill. In such case he shall append to the bill, at the time of signing it, a statement of the items to which he objects, and no item so objected to shall take effect. If the Legislature be in session, he shall transmit to the House in which the bill originated, a copy of such statement, and the items objected to shall be separately considered. If, on reconsideration, one or more of such items be approved by two-thirds of the members present of each House, the same shall be a part of the law, notwithstanding the objection of the Governor."

As provided for in the foregoing section of the Constitution, where any bill providing for several items of appropriation is presented to the Governor for his approval, he may object to one or more of such items, which items shall not take effect unless passed by both Houses by two-thirds of the members thereof.

If the appropriation for the Attorney-General's department contains one item of appropriation only, then the Governor's veto struck out the whole appropriation, but if the appropriation contained more than one item, the veto struck out only a part of such appropriation. It will therefore be necessary to determine, as a matter of law, whether the appropriation contains one or more items. Having determined that issue we will then proceed to determine whether the veto of the Governor struck out the whole or a part of the appropriation.

The first section of the bill was intended to and did contain all the language necessary to make the appropriation for all the subjects and departments of the Government provided for in the measure, and it was not therefore necessary that such language should be repeated in order to make such appropriations effective. A repetition of the language making the appropriation for the maintenance of the departments of government was not essential, and may be regarded, where repeated, as surplusage. It evidently was so regarded by the Legislature, for out of about sixty departments, commissions, institutions and subjects for which appropriations were made the appropriating language contained in section one of the bill has not been repeated, except in making the appropriation for the department of the Attorney-General. So that we regard the repetition of the language contained in section one made under the head of Attorney-General's department as without significance.

In making the appropriations for all the other departments of State and State Institutions the expense for the payment of salaries of officers and employees and other expenses are itemized or apportioned for each year ending August 31, 1912, and August 31, 1913, and then aggregated in the two columns for each year. The appropriation for the Attorney-General's department, as will be seen from an inspection

of same, as given above, does not itemize the appropriation or apportion the same as in the other cases, but enumerates the various purposes for which the aggregate sum of $83,160.00 may be expended under the direction and in the discretion of the Attorney-General. He is given a discretion not given the other heads of departments, and the force to be employed in his department is only limited as to the maximum number that may be employed, and the salaries to be paid them is not fixed as in other cases, but the provision fixes only such salaries as may not be exceeded. The sums that may be expended. for postage, stationery, telegrams, telephones, furniture, repairs, express, typewriters, and fittings, and contingent expenses are not fixed under the appropriation for this department as is done in all other departments, but for all of said purposes a sum is fixed which may not be exceeded. Such sum, however, may be expended under the provisions relating to this department for one or all of the enumerated purposes. In the respects last enumerated the provisions relating to the appropriation for the Attorney-General's department are both peculiar and significant. They are peculiar in that they are different from the provisions relating to any other department provided for in the bill, and significant in that they indicate either that greater confidence was imposed in the Attorney-General as the head of his department than in other heads of departments, or that the labors of the office of Attorney-General are more variable than those of other departments. Either incentive might furnish the purpose of the Legislature in so arranging .the appropriation for this department.

In making the appropriation for the Attorney-General's department the aggregate sum of $83,160.00 is appropriated in two separate and distinct sums of $41,580.00 each for the years ending August 31, 1912 and 1913. Whatever inference may be drawn from the language of the provisions of the bill relating to the Attorney-General's department as to the intent of the Legislature, it must be concluded indubitably that the sum of $83,160.00 was divided into two items of appropriation, one for $41,580.00 available for the year ending August 31, 1912, and a like sum for the year ending August 31, 1913. If this was not the intention of the Legislature, the words "For the years ending August 31, 1912—August 31, 1913," would not have been carried forward into the appropriation for this department. This view is strengthened by the division of the aggregate sum appropriated into two items and placed under the two year columns respectively.

The idea that only one item of appropriation was made for the Attorney-General's department, is rebutted by the legislative construction put upon that subject as expressed in the bill itself in what is called the "Recapitulation." The recapitulation is a statement of the aggregate sums appropriated for each fiscal year, and in this instance, is as follows:

## "RECAPITULATION."

| | For the years ending | |
|---|---|---|
| | Aug. 31, 1912 | Aug. 31, 1913 |
| Executive Office ...................... | $45,901.00 | $23,916.00 |
| Mansion and Grounds ................ | 8,650.00 | 1,650.00 |
| Department of State .................. | 20,770.50 | 19,480.00 |
| State Revenue Agent ................. | 4,550.00 | 4,450.00 |
| Public Buildings and Grounds ......... | 58,090.00 | 76,830.00 |
| Attorney-General's Department ......... | 41,580.00 | 41,580.00 |

It is clear to our minds that the Legislature intended and did appropriate two items of $41,580.00 each for the support of the department of the Attorney-General, and that the language referring to the sum of $83,160.00 was employed to designate the aggregate sum that was intended to be appropriated for that department for the two fiscal years before mentioned.

It is suggested as throwing light upon the legislative intent, that the clause contained in the proviso following the appropriation made for each department to the effect, "that no surplus shall be diverted from one account to another account," is left out of the provision in the appropriation for the Attorney-General's department. Leaving out that proviso could have been for one purpose only, to permit, if it does, the use of one appropriation for a definite purpose to be used for a different purpose when such sum has not been expended for the purpose originally designed. The effect of leaving out that proviso under the appropriation for the Attorney-General's department is not presented in this case for consideration.

Eliminating that clause from the provision making the appropriation under investigation can not be construed as indicating the purpose of the Legislature to make one distinct and separable item of appropriation for that department.

Read in the light of all the provisions of the bill and the separate and distinct appropriation of two sums or items for the two ensuing fiscal years, the language in the clause designed for the guidance of the Attorney-General may be read as for the guidance of the Attorney-General in the expenditure of such sums out of the above items of appropriation aggregating $83,160.00 as may be necessary to properly conduct the business of his department, etc. This construction is perfectly consistent with the other provisions of the appropriation, and the construction contended for by the relator and respondent that a single item of appropriation is made can not, in our judgment, be harmonized with the other provisions making the appropriation, as heretofore indicated. We therefore hold that there were two items of appropriation for the Attorney-General's department.

We next revert to the Governor's veto message and determine its effect.

In construing the purport of a veto message the same rules of construction that govern in construing legislative acts should be applied. The veto power when exercised is a legislative and not an executive

function.    Pickle v. McCall, 86 Texas, 223; Cooley on Const. Lim., 185; People v. Bowen, 21 N. Y., 517.

Tested by such rules of construction it is clear the Governor never intended to veto the entire appropriation made for the support of the department of the Attorney-General, for he so expressly declares his intention not to cripple that department. It is equally true that he did intend to veto a part of such appropriation. The question is what effect did the veto message have on the appropriation referred to in the light of the evident intent of the Governor? It will not do to take an isolated sentence, or paragraph, from the message and determine the meaning of the whole therefrom, but rather to take all its parts and harmonize them as near as may be practicable and from the whole message determine its purpose and effect. There can be no doubt but that the Governor intended to leave in that appropriation the sum of $41,580.00 appropriated for the year ending August 31, 1912, and to object to the item appropriating a like sum for the year ending August 31, 1913. It is altogether consistent with his express purpose to have stricken out the $83,160.00 contained in the clause making such appropriation, for that was but a summing up of the two items of $41,580.00 each and was surplusage and its elimination in no manner affected either of the two items of appropriation for the two years beginning September 1, 1911, and ending August 31, 1913. Section 1 of the bill made the appropriation for the support of all the departments, without repeating the language of appropriation. With the $83,160.00 stricken out the appropriation for that amount in two items was still effective in the bill for use by the Attorney-General.

The veto message left available for the support of the Attorney-General's department the sum of $41,580.00, which is subject to requisition by the Attorney-General during the year ending August 31, 1912. We therefore hold that the Governor vetoed the item for the department of the Attorney-General for the second year, amounting to $41,580.00, and left available the item of $41,580.00 appropriated for the first fiscal year ending August 31, 1912.

Especial stress seems to be laid upon the following language of the veto message: "The remaining item of $41,580.00, as appropriated, is available for use until exhausted, and may be applied during both of the fiscal years ending August 31, 1912, and August 31, 1913. If said sum of $41,580.00 is not sufficient for both of said years any additional amount actually needed for the efficient administration of the Attorney-General's office can be provided by deficiency allowance when the sum is ascertained to be necessary."

It is contended that the Governor by the use of the foregoing language has undertaken to change, alter and construct the appropriation bill, and thereby exercise a legislative function contrary to the intent of the Legislature itself. We do not think the message undertakes to do this, or that the complaint is well founded. The provisions of the bill as applied to the appropriation for the Attorney-General's department leaves the item of $41,580.00 for the year ending August 31, 1912, available. The veto message as we construe it on this point simply expresses an opinion as to the legal effect of the appropriation under the peculiar facts of the case as applied thereto, and does not

undertake to give the appropriation that effect by virtue of its fiat. We think under the circumstances of this case the complaint is attended with an undue exercise of solicitude.

The authority of the Governor to veto the language of the appropriation bill under the Attorney-General's department, which directs the method of his using the appropriation for that department, is questioned, and it devolves upon the court to determine that issue.

The duty of defining the power of the Executive in relation to the exercise of the veto privilege is, as suggested by Chief Justice Woods in the case of State v. Holder, 76 Miss., 177, one of difficulty and delicacy.

The veto power of the Executive under our system of government is not inherent in such officer as a legislative function, but is a power confided in him by the supreme authority of the State, and in exercising this function, while he is not confined to rules of strict construction, he nevertheless must look to the Constitution for the authority to exercise such power. The principle here enunciated has been aptly put by the Supreme Court of Illinois, in the case of Field v. People, 3 Ill., 79, in discussing the question of the Governor's veto power: "In deciding this question, recurrence must be had to the Constitution. That furnishes the only true rule by which the court can be governed. That is the charter of the Governor's authority. All the powers delegated to him or in accordance with that instrument, he is entitled to exercise, and no others. The Constitution is a limitation upon the powers of the Legislative Department of the Government, but it is to be regarded as a grant of powers to the other departments. Neither the Executive nor the Judiciary, therefore, can exercise any authority or power except such as clearly granted by the Constitution. Upon the principle of our Government, that the sovereign power of the State resides in the people, and that only such powers as they have deligated to their functionaries can be exercised, where a claim of power is advanced by the Executive, the question is not whether the power in question has been granted to the people, but whether it has been granted to the Executive; and, if the grant can not be shown, he has no title to the exercise of the power."

The Governor of Arizona, under Act of Congress, passed July 19, 1876, was authorized to exercise the veto power to the extent that if he does not approve a bill, he shall return it, together with his objections, to the House in which it originated. No authority was given the Governor by that Act to disapprove a bill in part. Exercising the power delegated him as above stated, the Governor of Arizona returned an appropriation bill to the House in which it originated with his signature, and added after his signature that he approved the bill except as to subdivision 17 of section 1. His veto thus expressed was by the Legislature sustained, but the Supreme Court of Arizona held that the bill, as a whole, became a law, as the Governor had no authority to veto a single item of an appropriation bill. Porter v. Hughes, 4 Ariz., 1, 32 Pac., 165.

The Executive, while in the exercise of the veto power, is exercising a legislative function, yet the authorities are uniform in holding that he has no power to construct legislation. His authority is surely nega-

tive. This principle was clearly laid down by Chief Justice Stayton in Pickle v. McCall, 86 Texas, 223, in the following paragraph: "The Legislature has the affirmative power to enact laws, while the Executive has only a negative power, by the constitutional exercise of which he may defeat the will of the majority of both Houses of the Legislature; but this power has no effect when, upon his veto, two-thirds of the members present in each House declare that a bill shall become a law."

Applying the rules above laid down, we find the Governor has power to disapprove any bill passed by both Houses of the Legislature, and that when he disapproves any bill, the same shall not become a law, unless reconsidered and approved by two-thirds of the members of both Houses. If the Legislature has adjourned at the time the Governor disapproves any bill the same fails to become a law. If a bill passed by the Legislature contains several items of appropriation the Governor is authorized to object to one or more of such items, and such item or items so objected to shall not become a part of the law, unless the Legislature be in session and such item or items objected to be reconsidered and approved by two-thirds of the members of both Houses.

The executive veto power is to be found alone in section 14, article 4 of the Constitution of this State. By that section he is authorized to disapprove any bill in whole, or if a bill contains several items of appropriation, he is authorized to object to one or more of such items. Nowhere in the Constitution is the authority given the Governor to approve in part and disapprove in part a bill. The only additional authority to disapproving a bill in whole is that given to object to an item or items where a bill contains several items of appropriation. It follows conclusively that where the veto power is attempted to be exercised to object to a paragraph or portion of a bill other than an item or items, or to language qualifying an appropriation or directing the method of its uses, he exceeds the constitutional authority vested in him, and his objection to such paragraph, or portion of a bill, or language qualifying an appropriation, or directing the method of its use, becomes noneffective. So that we are constrained to hold that that portion of the veto message contained in subdivision (3) of the statement of objections appended to the appropriation bill and filed in the office of the Secretary of State, was unauthorized and therefore noneffective, and the paragraph so attempted to be stricken out will remain as a part of the appropriation bill.

While the paragraph may not harmonize with the appropriation for the Attorney-General's department as modified by the veto message of the Governor, yet the language of this clause must in its application adjust itself to the changed condition of the appropriation to which it refers.

In view of the above holding it is therefore ordered that the clerk of this court issue the writ of mandamus as prayed for by relator directed to W. P. Lane, Comptroller of Public Accounts of the State of Texas, commanding him to issue and deliver to relator, Sterling R. Fulmore, a warrant upon the Treasurer of the State of Texas, for the sum of $100 for salary due relator as stenographic clerk of the Attorney-General due for the month of September, 1911, and that relator pay all costs of this proceeding.

Opinion filed November 4, 1911.

MR. CHIEF JUSTICE BROWN, concurring in the judgment, delivered a written opinion, for which his opinion on motion for rehearing was subsequently substituted as a statement of the reasons for his concurrence.

### ON MOTION FOR REHEARING.

MR. CHIEF JUSTICE BROWN delivered the following opinion.

I wrote the opinion heretofore filed by me in haste and with the view of expressing my concurrence with my associates. That opinion does not state clearly the reasons which influenced me in arriving at my conclusions as to the law of this case. With the consent of my associates I withdraw that opinion and will give my reasons in the disposition of this motion.

We agree that the question whether the excess, if any, of the appropriation for 1911-1912 will be available in the succeeding year is not properly before this court. That question has not been decided and no intimation to that effect was intended to be expressed in the former opinions. It is not the province of this court to decide upon rights which have not been presented to us, or upon questions which would in no way contribute to the proper determination of the issues presented here.

We all agree that the sum of $83,160.00, specified in the paragraph of the appropriation bill which related to the Attorney-General's department, constituted an item which the Governor had authority to veto.

Judge Ramsey is of opinion that the Governor did not intend to veto that item, which conclusion he supports with forcible arguments expressed in his opinion. Judge Dibrell and I are of opinion that the Governor intended to veto the item $83,160.00 and that his veto did have that effect.

I will here set out the parts of the bill which are pertinent to the question to be decided:

"Be it enacted by the Legislature of the State of Texas:

"Section 1. That the following sums of money, or so much thereof as may be necessary, be, and the same are hereby appropriated out of any moneys in the State Treasury not otherwise appropriated for the support of the State Government from September 1, 1911 to August 31, 1913.

### "ATTORNEY-GENERAL'S DEPARTMENT.

|  | For the years ending | |
|  | Aug. 31, 1912 | Aug. 31, 1913 |
| "For the support and maintenance of the Attorney-General's department, . . . there is hereby appropriated Eighty-Three Thousand and One Hundred and Sixty ($83,160.00) Dollars, to be expended during the two fiscal years ending August 31, 1912, and August 31, 1913, to be paid by the Treasurer on warrants drawn by the Comptroller upon vouchers approved by the Attorney-General. | $41,580.00 | $41.580.00" |

Vol. CIV. Supreme—33.

I omit the different items for which the sums might be expended as specified in the bill.

The Governor filed his objections to this portion of the appropriation bill, in these words: "The sum of Eighty-Three Thousand and One Hundred and Sixty ($83,160.00) Dollars is objected to and disapproved—first, because it is an excessive appropriation of the public funds for the purposes appropriated at a time when the burden of taxation upon the people of this State must necessarily be increased to supply deficits and pay the necessary expenses of Government; second, because the same is an invasion of the Constitution in that it is an attempt to make an appropriation in gross and not for specific purposes, as directed by the Constitution."

Indisputably this clear and explicit language had the effect to annul the item mentioned unless we are permitted to look to other language and circumstances to explain those terms. There is no ambiguity in the language nor is there any room for construction. We must get the intention of the Governor from that language, unless there be other language in the veto message which would authorize a conclusion that the Governor did not intend to veto that item.

It is urged with much force by the counsel for relator that the Governor did not intend to destroy the entire appropriation but undertook to preserve one-half of it to be used, which he could not do, therefore, his veto of the aggregate sum was not effective. The argument is that the Governor, having attempted to do that for which he had no authority, nullified the veto for which he had authority. Nothing that the Governor wrote into his veto message as to the effect of his action can have any influence on the construction of the veto itself, unless it shows that his intention was not to veto the aggregate sum and there is not a word which will justify such an inference.

The veto message being expressed in plain language we must derive the meaning and effect of the veto from the language used by the Governor. Dodson v. Bunton, 81 Texas, 658. In that case this court said: "But appellee argues that if not within the letter of the statute the case falls with its spirit. When the purpose of a legislative enactment is obvious from the language of the law itself there is nothing left to construction. In such case it is vain to ask the courts to attemp to liberate an invisible spirit supposed to lie concealed within the body of the law, and thus interpret away the manifest legislative intention by embracing subjects not fairly within the scope of the statute. The courts must enforce the laws as the Legislature has made them, and if the state of the case here presented requires regulating relief must be had in the legislative department."

We might add many cases from the decisions of this court as well as other authorities, but they are not needed. Judge Dibrell and I agree that the veto did annul the sum of $83,160.00 named as the appropriation for two years.

What effect did that veto have upon the sums specified in each column for the fiscal year 1911-1912 and the years 1912-1913? They were parts of the aggregate item of $83,160.00 and in our opinion fell by the veto of the main sum so far as they depended upon the appropriation made in that paragraph.

If the result should be that the Attorney-General's department would be without funds that would be disastrous to the State, which fact appeals to the court to look to the entire bill to find support for the appropriation. But this court can not legislate even to meet such condition. We must find it in the language of the law. When the appropriation made by the language used in that particular paragraph was annulled the paragraph was put upon the same basis as the paragraphs which made appropriations for other departments; neither had any adequate language to appropriate the sums named except by reference to section 1 of the bill and each must be read in connection with that section to give effect to appropriations made therein for each department. Therefore, after eliminating the sum of $83,160.00, the appropriation for the Attorney-General's department was dependent upon section 1 for its support. Writing that section and paragraph together, as they must be construed, we have appropriate language to make appropriation of the sums named which applies to every paragraph of the bill, and each must be read in the connection shown above in order to give it any effect. This bill definitely appropriates for the support of the Attorney-General's department the sum of $41,580.00 for each fiscal year, just as it makes appropriation for each department. All appropriations depend upon the same language and we are of opinion that the effect of the law was to create two items of $41,580.00 each and that the Governor had authority to veto either of them.

It is ordered that the motion be overruled.

Opinion filed November 22, 1911.

MR. JUSTICE RAMSEY, concurring in the judgment, delivered the following opinion.

This is an original action filed in this court by the relator, Sterling R. Fulmore, alleging, in substance, that he is an employee in the Attorney-General's office under a valid contract to receive compensation at the rate of $100 per month; that he has rendered services in accordance with the contract and is entitled to payment of his compensation, and that in compliance with the law he has presented to the Comptroller his account in the way of a proper and lawful voucher, duly verified and approved by the Attorney-General, and has requested the issuance of a warrant for same which has been refused by the Comptroller. It was further averred that his contract of employment with the Attorney-General was for the period of his present term of office, which would not expire until 1913, and that he would, under and by virtue of said employment, perform services thereunder and would in due season become entitled to the compensation fixed by said contract and that respondent will not only refuse to draw and deliver to relator a warrant for the payment of his salary for the month of September, as aforesaid, but also refuses and would refuse to draw or deliver to relator any warrant for any future month's salary notwithstanding relator would have earned the same and may have presented and filed with the respondent a proper and lawful voucher therefor, and that unless this honorable court shall order the issuance of a writ of mandamus as prayed for the respondent will continue to refuse to issue any warrant to relator for each and every month's salary so earned by him, com-

pelling a resort to mandamus proceedings in this court in order to obtain a warrant for the payment of his said salary, thus compelling relator to institute a multiplicity of suits in this court and to incur great trouble, inconvenience and expense.

The respondent filed in his own behalf an answer in which he entered a general demurrer to relator's petition, thus questioning the validity of relator's demand and invoking a decision as to whether or not provision had been made by law for the payment of the claim represented by the voucher and demand presented by relator. Respondent filed further answer to the effect and substance that by law and by section 5 of chapter 17 of the Acts of the Third Called Session of the Thirty-First Legislature he was made the sole accounting officer of the State, and that by section 10 of said Act he is required to audit claims of all persons against the State where provisions for the payment thereof has been made, and by section 14 of said Act he is prohibited from drawing any warrant on the Treasury unless an account first be made in pursuance of some specific appropriation and filed with him by some one duly authorized and verified by affidavit. Respondent therefore prays that in the event this court should grant the writ prayed for that it will determine the full effect of the Governor's action in respect to the appropriation made for the Attorney-General's department for each of the two fiscal years ending August 31, 1912 and August 31, 1913, so that respondent may not be subjected to further and additional writs of mandamus to require him to issue warrants against said appropriation. In other words, respondent prays the court to render such opinion and judgment as will make clear his duty now and hereafter in respect to said appropriation and warrants which he may draw against the same.

By agreement of parties all the exhibits as well as the briefs and arguments filed in cause No. 2323, Jewel P. Lightfoot, relator, v. W. P. Lane, Comptroller, respondent, were considered as filed in this case, and that same should be taken and considered as part of the record in this case and as exhibits to and filed with the original petition for mandamus in this cause for all purposes as though same were filed in this case originally.

The case of Lightfoot, relator, v. Lane, respondent, was argued elaborately and thoroughly at the bar of this court, not only by the parties of record, but by eminent counsel apearing as *amicus curiae,* and we have in addition thereto been furnished by all parties in interest with elaborate written and printed briefs and arguments. Notwithstanding the aid furnished, the question presented to us has been one of exceeding difficulty and one not wholly free from doubt and in respect to which this court has not been wholly free from differences of opinion. In order that the case may be fully understood and my opinion interpreted with reference to the conceded facts we shall make not only a fuller statement of the case itself but of the position of the respective parties than might ordinarily be deemed sufficient.

At the First Called Session of the Thirty-Second Legislature the General Appropriation Bill was passed. As originally enacted, so much of same as applied and related to the Attorney-General's department, it stood when finally passed in these words:

## "ATTORNEY-GENERAL'S DEPARTMENT.

"For the years ending
"Aug. 31, 1912    Aug. 31, 1913

"For the support and maintenance of the Attorney-General's department, including postage, stationery, telegrams, telephones, furniture, repairs, express, typewriters and fittings, contingent expenses, costs in civil cases in which the State of Texas or any head of a department is a party; for the actual traveling expenses and hotel bills incurred by the Attorney-General or any of his assistants or employees in giving attention to the business of the State elsewhere than in the city of Austin; for depositions and procuring evidence and documents to be used in civil suits or contemplated suits wherein the State is a party; for law books and periodicals; for the payment of any and all expenses incident to and connected with the administration of the duties of the Attorney-General's office; for the enforcement of any and all laws, wherein such duty devolves upon the Attorney-General; for the payment of any and all expenses in bringing, prosecuting and defending suits; for the payment of the salary and maximum fees provided by the Constitution for the Attorney-General, and for the payment of the salaries and compensation of his assistants and employees and other help deemed by the Attorney-General to be necessary to carry on the work of the Attorney-General's department, there is hereby appropriated the sum of Eighty-Three Thousand and One Hundred and Sixty ($83,160.00) Dollars, to be expended during the two fiscal years ending August 31, 1912, and August 31, 1913, to be paid by the Treasurer on warrants drawn by the Comptroller upon vouchers approved by the Attorney-General.      $41,580.00    $41,580.00

"For the guidance of the Attorney-General in the expenditure of such sums out of the above item of appropriation of $83,160.00 as may be necessary to properly conduct the business of his department, he is hereby empowered and authorized to employ such regular assistants as he may deem necessary, not to exceed seven in number at any one time, one of such assistants he shall designate as First Office Assitant Attorney-General; and there may be expended out of the above item

of appropriation a sum not exceeding $20,000 per annum for the purpose of paying the salary of the Attorney-General at $2,000.00 per annum and such fees as are prescribed by law, not to exceed $2,000.00 per annum, and for the purpose of paying the salaries of the assistants employed; provided that no assistant shall receive more salary than $2,500.00 per annum; and the Attorney-General shall have the power and authority to employ such stenographic clerks as he may deem necessary to carry on the work of the department, not to exceed four in number, one of whom shall be chief clerk and bookkeeper; and there may be expended out of the above item of appropriation a sum not to exceed $4,900.00 per annum to pay the salaries of such stenographic clerks, provided that no stenographic clerk shall receive more than $1,300.00 per annum; there may be employed one porter who shall be paid out of the above item of appropriation a salary of $480.00 per annum; there may be expended out of the above item of appropriation, for postage, stationery, telegrams, telephones, furniture, repairs, express, typewriters, and fittings and contingent expenses so much thereof as may be necessary, not to exceed the sum of $1,350.00 per annum. The remainder of the above item of appropriation, or so much thereof as may be deemed necessary by the Attorney-General, shall be expended for costs in civil cases in which the State of Texas or any head of a department is a party; for the actual traveling expenses and hotel bills incurred by the Attorney-General, or any of his assistants or employees, in giving attention to the business of the State elsewhere than in the city of Austin; for depositions and procuring evidence and documents to be used in civil suits, or contemplated suits, wherein the State is a party; for law books and periodicals; and for the enforcement of any and all laws of the State of Texas wherein that duty devolves upon the Attorney-General, and for the payment of any and all expenses deemed necessary by the Attorney-General in the prosecution and defense of all suits, and particularly for the enforcement of the anti-trust and corporation laws and for the employment of special counsel and other help when the same may be deemed necessary by the Attorney-General, provided that the head of said department shall keep a record of the absences of the various employees and the reasons therefor, whether from sickness, vacation or on leave of absence, and that the record of such absence be incorporated in the report made biennially by the head of said department; provided, that the amount herein appropriated as stated herein, and no more, shall be paid out of the general revenue for the Attorney-General's department during the fiscal years beginning September 1, 1911, and ending August 31, 1913, and provided further, that no deficiency shall be created, nor shall any warrants be issued nor obligations incurred in excess of the amounts herein appropriated."

In due time the Governor filed in respect to said appropriation the following veto which was transmitted to the Legislature then in session:

"Executive Office, Austin, Texas, Aug. 29, 1911.
"To the Senate and House of Representatives:
"  .  .  .  I regret exceeding the necessity for having to veto any portion of the appropriation for the executive departments of the State

Government. I regret that the Legislature felt it incumbent upon itself to seek to deprive the Governor of the constitutional prerogative of vetoing any item for any department where in his judgment such appropriation was excessive or unnecessary. In the bill as filed with the Secretary of State I have exercised this prerogative, nevertheless, and vetoed the lump sum of $83,160.00 appropriated to the Attorney-General's department. After making this lump appropriation in one item, the Legislature divided the same into two items of $41,580.00 each for the fiscal years ending August 31, 1912 and 1913, respectively. By striking out the lump appropriation and the words describing the same, and the appropriation of $41,580.00 for the second year, the sum of $41,580.00 is left subject to the use of the Attorney-General for the maintenance of his department for the two fiscal years named, any portion of which can be used, under the language of the bill, for any purpose in carrying on the duties of his office. This is not as much, perhaps, as should be appropriated to this department. I have no desire to cripple its efficiency, but under all the circumstances I felt impelled to take the course I have in this instance. If further means are needed to carry on the work of said department, as shown in the statement filed with the Secretary of State, I shall be glad to approve application for necessary deficiency warrants to meet all necessary expenses of that department.

"I find by reference to the appropriation for this department by the Thirty-First Legislature that the sum of $34,830.00 was appropriated for the fiscal year ending August 31, 1910, and $24,330.00 for the fiscal year ending August 31, 1911, or a total of $59,160.00 for the two years. Of this amount about $11,902.00 has lapsed or will lapse, showing that the total requirements of that department for the last two years, with an increased force of assistants, was $47,258.00. In view of these facts the sum of $83,160.00 for the two years ending August 31, 1913, was deemed by me to be excessive, and should not have been asked for, especially in view of the unsatisfactory condition of the finances of the State at this time.

"On account of the manner in which the appropriation was made, no other course was left open to me than to veto the bulk sum of $83,160.00 and the item of $41,580.00 for the second year. Even under present conditions and taking the expenditures for the last two fiscal years as a basis, it will not require more than $6,000.00 or $7,000.00 deficiency to meet the requirements of the Attorney-General's office up to the 31st day of August, 1913. The sum which remains in the bill subject to the Attorney-General's unconditional control, as seems to have been the wish and will of the Legislature, will be amply sufficient, even upon the present expensive basis under which that department is conducted, to last him until the next Legislature meets in January, 1913, without even a deficiency. The paragraph containing the items which follow the appropriations for the respective years named is vetoed, because it is out of harmony with the remainder of the appropriation after the objections already noted and the items named were disapproved."

On the same day the Governor filed with the Secretary of State the following memorandum:

"Executive Office, Austin, Texas, August 29, 1911.
"To the Secretary of State:

"As provided in section 14 of article 4 of the Constitution of Texas, I transmit herewith for file in the office of the Secretary of State, Free Conference Committee Substitute for Senate Bill No. 3, said bill being 'An Act making appropriations for the support of the State Government for two years beginning September 1, 1911, and ending August 31, 1913, and for other purposes, and prescribing certain regulations and instructions in respect thereto, to make additional appropriation for the support of the State Government for the year ending August 31, 1911, and to pay various miscellaneous claims against the State, and declaring an emergency,' said bill having passed the First Called Session of the Thirty-Second Legislature of the State of Texas, and having been received in the Governor's office on August 26, 1911, at 6:30 p. m.

"Said Free Conference Committee Substitute for Senate Bill No. 3 has been signed by me on this date, and the items therein not objected to are approved. I append to the said bill at the time of signing the same this statement, showing the items to which I object, and the reasons therefor. Where the items objected to have no special reason assigned for that action, they are vetoed on the ground that the appropriations are not essential to the efficient administration of the State Government or of the particular department for which they have been made. I have run a blue pencil through said items objected to, as well as the words describing them, as follows, except where the appropriation covers a period of two years and that for only one year is vetoed:

"...                          "Attorney-General's Department.

"(1) On page 30, the item in words as follows: 'the sum of Eighty-Three Thousand and One Hundred and Sixty ($83,160.00) Dollars,' is objected to and disapproved, first, because it is an excessive appropriation of the public funds for the purposes appropriated at a time when the burden of taxation upon the people of this State must necessarily be increased to supply deficits and pay the necessary expenses of government; second, because the same is an evasion of the Constitution, in that it is an attempt to make an appropriation in gross and not for specific purposes as directed by the Constitution.

"(2) The item on page 30, of $41,580.00, for the fiscal year ending August 31, 1913, is objected to and disapproved. The remaining item of $41,580.00, as appropriated, is available for use until exhausted, and may be applied during both of the fiscal years ending August 31, 1912, and August 31, 1913. If said sum of $41,580.00 is not sufficient for both of said years any additional amount actually needed for the efficient administration of the Attorney-General's office can be provided by deficiency allowance when the same is ascertained to be necessary.

"(3) The following language, beginning on page 30 and concluding on page 34, is objected to and disapproved for the reason that it is not in harmony with the appropriation for the Attorney-General's department in consonance with the objections to the two items already eliminated as outlined above."

So that when the bill reached the office of the Secretary of State it appeared in this condition:

## "ATTORNEY-GENERAL'S DEPARTMENT.

"For the years ending
"Aug. 31, 1912  Aug. 31. 1913

"For the support and maintenance of the Attorney-General's department, including postage, stationery, telegrams, telephones, furniture, repairs, express, typewriters and fittings, contingent expenses, costs in civil cases in which the State of Texas or any head of a department is a party; for the actual traveling expenses and hotel bills incurred by the Attorney-General or any of his assistants or employees in giving attention to the business of the State elsewhere than in the city of Austin; for depositions and procuring evidence and documents to be used in civil suits or contemplated suits wherein the State is a party; for law books and periodicals; for the payment of any and all expenses incident to and connected with the administration of the duties of the Attorney-General's office; for the enforcement of any and all laws, wherein such duty devolves upon the Attorney-General; for the payment of any and all expenses in bringing, prosecuting and defending suits; for the payment of the salary and maximum fees provided by the Constitution for the Attorney-General, and for the payment of the salaries and compensation of his assistants and employees and other help deemed by the Attorney-General to be necessary to carry on the work of the Attorney-General's department, there is hereby appropriated ~~the sum of Eighty-three Thousand and One Hundred and Sixty ($83,160.00) Dollars~~ to be expended during the two fiscal years ending August 31, 1912, and August 31, 1913, to be paid by the Treasurer on warrants drawn by the Comptroller upon vouchers approved by the Attorney-General.                        $41,580.00    ~~$41,580.00~~

~~"For the guidance of the Attorney-General in the expenditure of such sums out of the above item of appropriation of. $83,160.00 as may be necessary to properly conduct the business of his department, he is hereby empowered and authorized to employ such regular assistants~~

as he may deem necessary, not to exceed seven in number at any one time, one of such assistants he shall designate as First Office Assistant Attorney-General; and there may be expended out of the above item of appropriation a sum not exceeding $20,000.00 per annum for the purpose of paying the salary of the Attorney-General at $7,000.00 per annum, and such fees as are prescribed by law, not to exceed $2,000.00 per annum, and for the purpose of paying the salaries of the assistants employed; provided that no assistant shall receive more salary than $2,500.00 per annum; and the Attorney-General shall have the power and authority to employ such stenographic clerks as he may deem necessary to carry on the work of the department, not to exceed four in number, one of whom shall be chief clerk and bookkeeper; and there may be expended out of the above item of appropriation a sum not to exceed $4,000.00 per annum to pay the salaries of such stenographic clerks, provided that no stenographic clerk shall receive more than $1,300.00 per annum; there may be employed one porter who shall be paid out of the above item of appropriation a salary of $480.00 per annum; there may be expended out of the above item of appropriation, for postage, stationery, telegrams, telephones, furniture, repairs, express, typewriters, and fittings and contingent expenses so much thereof as may be necessary, not to exceed the sum of $1,350.00 per annum. The remainder of the above item of appropriation, or so much thereof as may be deemed necessary by the Attorney-General, shall be expended for costs in civil cases in which the State of Texas or any head of a department is a party; for the actual traveling expenses and hotel bills incurred by the Attorney-General, or any of his assistants or employees in giving attention to the business of the State elsewhere than in the city of Austin; for depositions and procuring evidence and documents to be used in civil suits; or contemplated suits, wherein the State is a party; for law books and periodicals; and for the enforcement of any and all laws of the State of Texas wherein that duty devolves upon the Attorney-General and for the payment of any and all expenses deemed necessary by the Attorney-General in the prosecution and defense of all suits, and particularly for the enforcement of the anti-trust and corporation laws and for the employment of special counsel and other help when the same may be deemed necessary by the Attorney-General, provided that the head of said department shall keep a record of the absences of the various employees and the reasons therefor, whether from sickness, vacation or on leave of absence, and that the record of such absence be incorporated in the report made biennially by the head of said department; provided, that the amount herein appropriated as stated herein, and no more, shall be paid out of the general revenue for the Attorney-General's department during the fiscal year beginning September 1, 1911, and ending August 31, 1913, and provided further, that no deficiency shall be created, nor shall any warrants be issued nor obligations incurred in excess of the amounts herein appropriated."

The matter marked out in blue pencil representing the portion undertaken to be vetoed, and as it appears in the printed laws, it appears in the following abbreviated and changed form:

"ATTORNEY-GENERAL'S DEPARTMENT.

"For the years ending
"Aug. 31, 1912 Aug. 31, 1913

"For the support and maintenance of the Attorney-General's department, including postage, stationery, telegrams, telephones, furniture, repairs, express, typewriters and fittings, contingent expenses, costs in civil cases in which the State of Texas or any head of a department is a party; for the actual traveling expenses and hotel bills incurred by the Attorney-General or any of his assistants or employees in giving attention to the business of the State elsewhere than in the city of Austin; for depositions and procuring evidence and documents to be used in civil suits or contemplated suits wherein the State is a party; for law books and periodicals; for the payment of any and all expenses incident to and connected with the administration of the duties of the Attorney-General's office; for the enforcement of any and all laws, wherein such duty devolves upon the Attorney-General; for the payment of any and all expenses in bringing, prosecuting and defending suits; for the payment of the salary and maximum fees provided by the Constitution for the Attorney-General, and for the payment of the salaries and compensation of his assistants and employees and other help deemed by the Attorney-General to be necessary to carry on the work of the Attorney-General's department, there is hereby appropriated to be expended during the two fiscal years ending August 31, 1912, and August 31, 1913, to be paid by the Treasurer on warrants drawn by the Comptroller upon vouchers approved by the Attorney-General.                    $41,580.00"

There was presented in argument three radically variant and diverse propositions. It was the contention of relator that the attempted veto was wholly ineffective for any purpose, and that the bill as originally passed was and is the law of this State and in full operation and effect, and, in support of this view, counsel present the following:

"1. That the Governor exceeded the power granted by the Constitution, in that he sought to veto parts of an item.

"2. Without authority from the Constitution, he further attempted

to change a conditional appropriation into an absolute, unrestricted and unconditional one.

"3. Without constitutional authority, he attempted by the use of blue pencil, and did mutilate, obliterate and efface language and figures contained in the item of appropriation as presented to him.

"4. He treated the appropriation as containing three distinct, separate and divisible items and struck out two items and approved the remaining one; and then sought to make the amount in the remaining item of appropriation available over the entire two fiscal years; thus seeking to amend and alter the bill; or, recognizing that the said item approved was so indivisible and inseparable from the remainder of the bill that he could not leave said item available only for the first fiscal year, thus attempting to veto part of an item.

"5. That the Governor, in attempting to exercise the veto power as he did, exceeded his functions and powers under the Constitution, in that he legislated and attempted to create and initiate law.

"6. The attempted veto was null and void and can not be given effect, according to the executive intent, because, under the Constitution, the Governor was without authority to veto the amount of $41,580.00, unless the said amount was a separate and distinct item in no wise dependent upon any other part of the bill; and if it was such an item, when it was stricken from the bill, it left the Attorney-General's department without any appropriation whatever for the second year, and no part of the amount appropriated for the first year, in a separate and distinct item, could be made to extend into the second fiscal year."

On behalf of the respondent it was urged in a written argument filed by him that the item of $83,160.00, appropriated for the Attorney-General's department, was a single sum, indivisible and entire, and that the act of the Governor in specifically vetoing that sum had the effect in law, with reference to the other matter included in the veto, of disapproving the entire item and that there was now no appropriation existing for the Attorney-General's department in any sense or in any amount.

The *amicus curiae,* who appeared by permission of the court, urged with great force that, considered in its true light, the appropriation bill, as passed by the Legislature, clearly fixed and named two items of $41,580.00 each, and that the Governor in vetoing the second item for the year ending August 31, 1913, was clearly within his rights and that the veto of this item left the other sum of $41,580.00 unaffected and that the sum remained in force as a valid appropriation. It was also suggested in argument that it was within the power of the Governor to reduce by veto any item deemed by him to be extravagant, though this position is not in terms assumed and set forth in their printed argument.

These views which were urged upon us with great force and ability will indicate the position of the respective parties and it becomes our duty to undertake to settle and decide what view is correct and what view should prevail. In order to do this some attention should probably be paid, not only to the nature of the right of veto granted to the executive, but to the rules of construction which should apply in

respect thereto. There is much curious learning in the books in respect to the right of the veto and to what extent the exercise of such right is the exercise of the legislative or executive power. We do not think that a discussion of this question is important or material, though it seems generally to have been held that the right of the veto is, in a sense at least, legislative in its character.

In early times the right of veto was very strictly construed. The tendency of modern times, and it seems to us the better reasoning, support the position that such power of veto should be fairly construed so as to give effect to the constitutional warrant vested in the executive to veto what is deemed by him unwise legislation. There is, of course, this difference which should be recognized by all lawyers and students of our Constitution, the Legislature has paramount and plenary power of legislation in respect to all matters where such power is not either vested in the general government or denied to the Legislature by constitutional limitations, whereas the rights of veto must depend upon a grant of power in the constitution and is limited by the terms of such grant fairly and reasonably interpreted. We think, too, that it must be regarded as settled by the authorities, and it seems to us undeniably true in reason, that the terms of an executive veto should be interpreted by the same rules which govern and guide courts in considering the legal effect of enactments of lawmaking bodies. It may therefore aid us in passing on the veto in this case to recur to some rules of construction. These, for the most part, are familiar, but a frequent recurrence to the settled maxims of the law always aids in its proper interpretation. As said by the eminent Chief Justice Hemphill, in the case of Cannon v. Vaughan, 12 Texas, 399: "Among the most important of these rules are the maxims that the intention of the Legislature is to be deduced from the whole and every part of a statute, when considered and compared together; that the real intention, when ascertained, will prevail over the literal import of the terms; and that the reason and intent of the legislator will control the strict letter of the law, when the latter would lead to palpable injustice, contradiction, and absurdity; that when the words are not explicit the intention is to be collected from the occasion and necessity of the law, and from the mischief and objects and remedy in view; and the intention is to be presumed according to what is consonant to reason and good discretion. It is another established rule that all acts in *pari materia* are to be taken together, as if they were one law, and that if it can be gathered from a subsequent statute, in *pari materia,* what meaning the Legislature attached to the words of a former statute, this will amount to a legislative declaration of its meaning, and will govern the construction of the first statute. These and other rules by which the sages of the law have been guided in seeking for the intention of the lawgiver, have been accumulated by the experience and ratified by the approbation of ages."

It is a further rule, well established, that we should not, unless required to do so, give such a construction to the Governor's veto as would necessarily occasion great public and private mischief, but a construction will be preferred which will occasion neither, unless the latter would do violence to a well settled rule of law.

Let us next look to the authority of the Legislature to make appropriations, and particularly to ascertain for what length of time such appropriations may be made. This power is found and such time fixed by section 6 of article 8 of our Constitution, which is as follows:

"No money shall be drawn from the Treasury but in pursuance of specific appropriations made by law; nor shall any appropriations of money be made for a longer term than two years, except by the first Legislature to assemble under this Constitution, which may make the necessary appropriations to carry on the government until the assemblage of the Sixteenth Legislature."

It must, therefore, seem obvious, and is indeed demonstrably clear that it was within the power of the Legislature to make in a single item an appropriation for the Attorney-General's department for a full period of two years.

Let us next see what is the power of the Governor in this State in respect to the right to veto. This power is fixed and limited in sections 14 and 15 of article 4 of our State Constitution. They are as follows:

"Section 14. Every bill which shall have passed both Houses of the Legislature shall be presented to the Governor for his approval. If he approve, he shall sign it; but if he disapprove it, he shall return it, with his objections, to the House in which it originated, which House shall enter the objections at large upon its journal, and proceed to reconsider it. If, after such reconsideration, two-thirds of the members present agree to pass the bill, it shall be sent, with the objections, to the other House, by which likewise it shall be reconsidered; and if approved by two-thirds of the members of that House, it shall become a law; but in such cases the votes of both Houses shall be determined by yeas and nays, and the names of the members voting for and against the bill shall be entered on the journal of each House respectively. If any bill shall not be returned by the Governor with his objections within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature, by its adjournment, prevent its return; in which case it shall be a law, unless he shall file the same, with his objections, in the office of the Secretary of State, and give notice thereof by public proclamation within twenty days after such adjournment. If any bill presented to the Governor contains several items of appropriation, he may object to one or more of such items, and approve the other portion of the bill. In such case he shall append to the bill, at the time of signing it, a statement of the items to which he objects, and no item so objected to shall take effect. If the Legislature be in session, he shall transmit to the House in which the bill originated a copy of such statement, and the items objected to shall be separately considered. If, on reconsideration, one or more of such items be approved by two-thirds of the members present of each House, the same shall be part of the law, notwithstanding the objections of the Governor. If any such bill, containing several items of appropriation, not having been presented to the Governor ten days (Sundays excepted) prior to adjournment, be in the hands of the Governor at the time of adjournment, he shall have twenty days from such adjournment within which

to file objections to any items thereof, and make proclamation of the same, and such item or items shall not take effect.

"Section 15. Every order, resolution or vote, to which the concurrence of both Houses of the Legislature may be necessary, except on questions of adjournment, shall be presented to the Governor, and, before it shall take effect, shall be approved by him; or, being disapproved, shall be repassed by both Houses, and all the rules, provisions and limitations shall apply thereto as prescribed in the last preceding section in the case of a bill."

It will be noted that every *bill* which shall have passed both Houses of the Legislature, which shall not be returned by the Governor with his objections, shall be a law in like manner as if he had signed it. Whereas, in respect to orders, resolutions or votes named in section 15 of article 4 of our Constitution, they shall be held not to take effect until either approved by the Governor, or being disapproved, shall be repassed by both Houses.

With these general statements, let us then proceed to determine, first, whether the entire appropriation for the Attorney-General's department has been vetoed. That there is much strength in this contention, I think an inspection of the veto will demonstrate. The unequivocal language vetoing, what is termed by the Governor, the lump sum of $83,160.00, being the entire sum appropriated for two years, if it had stood alone, would undoubtedly have this effect, but did the Governor intend that his veto should have this effect, and is this a fair conclusion derivable from his entire message? In determining this question, we should undertake to do so, in fairness, from all the language used, and testing same by the circumstances and conditions with reference to which it was used. In other words, we should adopt the rule epitomized in one of Charles Read's great master pieces "Put yourself in his place." The Governor, of course, must be credited with knowing the great importance to the people of this State of the Attorney-General's office. In all matters touching the enforcement of the law that office should be to the Governor as truly his right arm as Jackson was the right arm of Lee. This office has grown greatly not only with time, but in the scope and extent of its activities, wih the growth of the State and the many diverse interests to be affected by it. Under our laws no charter of any railroad, or bond of any county, municipality, or school district can be registered or become valid until approved by the Attorney-General's department. He represents the State in all trust prosecutions, is the adviser of all heads of departments, and in all suits to which the Railway Commission is a party. In view, therefore, of the great importance of the office, it is inconceivable that any Governor of Texas could have intentionally meant by veto to have stricken down this great department of the State Government, and left it without means of rendering effective service. Again the veto of the Governor itself bears intrinsic evidence that such was not his intention. If he had meant to veto the entire item, he might have stopped and would have stopped with the language vetoing the lump sum of $83,160.00, or in any event would have blue-penciled the entire appropriation. On the other hand, the language of the veto undertakes to make effective what by him was deemed an item thereof,

and in addition gives assurance that if any further sum is required, that deficiency warrants would be allowed by him for such sums as might be necessary for its support. We may, therefore, we think, and should, we think, lay aside the view and decline to sustain this contention of the respondent.

We next come to the question: Was the item of $83,160.00 a single item, or were there two items, as that word is used in the Constitution, of $41,580.00 each, one ending August 31, 1912, and the other ending August 31, 1913? My own judgment is that it is a single item, and, therefore, as a single item, beyond executive veto, unless vetoed in its entirety. The reasons for this opinion, briefly stated, are, as shown by the journal, admitted in evidence: The appropriation bill as originally introduced was in the usual form in which such appropriations had theretofore been made, and contained many clearly distinct and several items. As such appropriation appeared in the original bill, we find it as stated in the brief of *amicus curiae* to have been in the following form:

"Attorney-General's Department.

|  | "For the years ending | |
|  | "Aug. 31, 1912 | Aug. 31, 1913 |
| "Salary of Attorney-General ........ | $2,000.00 | $2,000.00 |
| "And the further sum each year, or so much thereof as may be necessary to pay such fees as may be prescribed by law ................ | 2,000.00 | 2,000.00 |
| "Salary of First Assistant........... | 2,500.00 | 2,500.00 |
| "Salary of Second Assistant ......... | 2,500.00 | 2,500.00 |
| "Salary of Third Assistant .......... | 2,000.00 | 2,000.00 |
| "Salary of Fourth Assistant, who shall assist the Attorney-General in enforcing the anti-trust laws ........ | 2,500.00 | 2,500.00 |
| "Salary of Fifth Assistant .......... | 2,000.00 | 2,000.00 |
| "Salary of Record Clerk and Bookkeeper, who shall also discharge the duties of stenographic clerk ...... | 1,400.00 | 1,400.00 |
| "Salary of two stenographic clerks.... | 2,400.00 | 2,400.00" |

On August 11 of this year, when the appropriation for the Attorney-General's department was reached in the Senate, an amendment to the items relating to the salary of the assistants to the Attorney-General was offered in this language:

"Amend the bill, page 26, by striking out all of lines 16-17-18-19-20-21-22, and insert in lieu thereof the following: Salary of seven assistants, one of whom shall be designated First Office Assistant Attorney-General, three of the seven shall each receive $2,500.00 per year and the remaining four shall each receive the sum of $2,000.00 per year—$15,500.00 for each year."

And on the same day a substitute for said amendment was offered and adopted which was precisely the same as that contained in the bill

as finally adopted by the Legislature. Thereafter the bill went to a free conference committee on the part of both Houses, which reported a substitute appropriation bill, but so far as same related to the Attorney-General's department, it contained exactly the same language as the substitute referred to above, and as was finally adopted by both Houses. It will thus be observed that the amendment offered in the Senate grouped into one item five of the items in the original bill relating to the salary of the assistants to the Attorney-General. The substitute which was offered and became a law grouped all of the eighteen separate and distinct items contained in the original bill and made but one entire item of them all. This is the only department of the State Government in respect to which such a measure was passed. It is further to be noted as significant that the words of appropriation which appear in the general appropriation bill in respect to the more than sixty departments of the State Government, contained no words of appropriation except that appearing in the first section thereof, but when the Attorney-General's department is reached, it is in terms stated that there is hereby appropriated the sum of $83,160.00. We think it may be conceded that if these words of appropriation in this particular section had not been used, that the words of appropriation appearing in the first section would be applied thereto, but the use of this language of appropriation in respect to the Attorney-General's department, to my mind, evidences a clear and unequivocal intention to make a specific, clear, unambiguous and single appropriation for the two years of $83,160.00. With the reasons which controlled the Legislature in framing the appropriation bill in this manner, we have here nothing to do. The wisdom of grouping many items of appropriation into a single item, it is not our province to determine, even if it could be assumed that it was purposely and deliberately done so as to deny to the Governor the right to prune or cut out any part or portion of the amount appropriated, because it was within the power of the Legislature to make the appropriation in this manner, and same was not subject to any constitutional or legal objection. It certainly was not obnoxious to the constitutional objection that it was not a specific appropriation. This was clearly held in the case of Terrell v. Sparks, 135 S. W., 519.

There is another reason why, in my judgment, this is a single item within the meaning of the Constitution, and that the guidance clause of the bill makes provision for the use of this sum, and that all the provisions thereof are interdependent with, relate to, contemplate and involve only the conclusion and assumption that there was a single item of appropriation. It will be noticed by a perusal of the bill that $20,000.00 is appropriated for the purpose of paying the salary of the Attorney-General and his assistants; that $4,900.00 may be used in payment of stenographic clerks; that $480.00 per annum may be paid for a porter, and $1,350.00 may be expended for postage, stationery, telegrams, furniture, fittings and contingent expenses, making a total of $26,730.00 for each year, and that in addition thereto the Attorney-General is permitted to spend the remainder for any year for the enforcement of any and all laws of this State wherein that duty devolves upon the Attorney-General, and for the payment of any and all ex-

penses deemed necessary by the Attorney-General for the enforcement of the anti-trust and corporation laws, and for the employment of special counsel and other help when same may be deemed necessary by the Attorney-General. These provisions are so linked and intertwined with the general appropriation of a lump sum of $83,160.00 as, in my opinion, stamped the appropriation as one single gross item to be distributed and used subject to the guidance clause of the Act, and for a period of two years, and that by the insertion in the beginning of the sentence making provision for the Attorney-General's department, there is hereby appropriated the sum of $83,160.00 to be expended during the two fiscal years ending August 31, 1912, and August 31, 1913, the Legislature deliberately and purposely meant to stamp it with the character and quality of a single item. I think this view is further strengthened by a comparison with other sections of the bill—some sixty or more. In all the other sections there are no special words of appropriation but simply designation of amounts in detail. There would seem to be no occasion for this purposeful and deliberate change except with the idea and intent and for the purpose of making it a single item and thus placing the several sums, which the Legislature must have contemplated would be expended, beyond executive veto and condemnation. Again it is to be noticed that immediately following the arbitrary division of this single item as $41,580.00 ................$41,580.00, the Act reads: "For the guidance of the Attorney-General in the expenditure of such sums of the above *item* of appropriation of $83,160.-00." Now here is a legislative declaration that there is only one item of appropriation, and that this item is $83,160.00, and such declaration should, it seems to me, be conclusive on this court. But this is not all. Later in the same sentence it is said: "And there may be expended out of the above item (that is the item of $83,160.00) of appropriation a sum not exceeding $20,000.00 per annum;" and again it is said in the same sentence: "And there may be expended out of the above item of appropriation (evidently the same $83,160.00) a sum not exceeding $4,900.00 per annum." And still again it is said in the same sentence: "There may be employed one porter who shall be paid out of the above item of appropriation (evidently the same $83,160.00) a salary of $480.00 per annum." And further it is said: "There may be expended out of the above item of appropriation (that is the item which the Legislature had in set terms stated to be $83,160.00) for postage, etc., not to exceed the sum of $1,350.00;" and finally, as if to place the matter beyond the possibility of doubt or misconception, the Legislature wrote: "The remainder of the above item of appropriation (still the same sum of $83,160.00) or so much thereof as may be deemed necessary by the Attorney-General, shall be expended" for traveling expenses of himself and assistants, for depositions, and procuring evidence, for law books, for the enforcement of the law, and for the employment of special counsel, and the Act having reference to the Attorney-General's department, closes with this provision: "provided that the amount herein appropriated as stated herein and no more shall be paid out of the General Revenue for the Attorney-General's department during the fiscal years beginning September 1, 1911, and ending August 31, 1913, and provided further that no deficiency

shall be created, nor shall any warrant be issued, nor obligation incurred in excess of the amounts herein appropriated."

These views which might be elaborated at greater length have inclined me strongly to the opinion that the item of $83,160.00 is a single item, and that the mere fact that it is divided into two sums of $41,580.00 each, and that these sums are set under the years 1912 and 1913 as other appropriations, does not in any manner affect the legal status of the $83,160.00 as a single item of appropriation. If the conclusion is sound that there is a single item of appropriation, and this item is the item of $83,160.00, then we have all agreed that only one of two conclusions is possible, and that is either that the entire appropriation of the Attorney-General is destroyed by the veto, or that none of it is affected. However, if it be conceded that there are two items of appropriation, one of $41,580.00 for 1912, and the other for the same amount for the year ending August 31, 1913, it must seem evident that the veto, considering it altogether, must fail, and that it is ineffectual for any purpose.

I have not been able to see the force in the suggestion that there are *three* items in the appropriation. By item must be meant a sum set apart to be expended and not a mere total made by the addition of two or more items. If the sum of $83,160.00 is an item and the two sums of $41,580.00 are each items, then it would result that there was an appropriation of $166,320.00 for the Attorney-General's department, which manifestly is not the case.

Can the veto be sustained on the theory and based on the position that the two sums of $41,580.00 were separate and distinct items and that one of them was vetoed? To determine this question properly it is necessary to consider a number of questions bearing upon and having relation to this matter. In the first place, it seems to be undoubtedly true, and in this position Chief Justice Brown and myself thoroughly agree, that if it be assumed that the first item of $41,580.00 was appropriated for the year ending August 31, 1912, and the other item of $41,580.00 was set aside and appropriated for the year ending August 31, 1913, that no part of any unexpended balance for the year 1912 could be used for the year ending in 1913. It may be suggested that the words "and no surplus shall be diverted from one account to another," appearing in respect to all the other distinct subjects of appropriation, which do not appear in the appropriation for the Attorney-General, would sustain the proposition that the unexpended balance of the appropriation for 1912, could be carried over and made available for 1913. This, however, is not the law. What this provision means is that if it is found that any appropriation, say, for example, $7,000.00 appropriated for improvements and furniture for the Governor's Mansion, was found excessive and not needed for that purpose, that such excess could not be carried over and used and appropriated for labor and employees in the Mansion. It does not mean, and can not mean, that if any portion of the $41,580.00, which the argument assumes was appropriated for 1912, would be available for 1913. The absence of the usual provision "and no surplus shall be diverted from one account to another" is due to the fact that since the item or items in the Attorney-General's appropriation, are not specified, it could have,

properly, no place in the language in making an appropriation for that department.

Again, we all agree that what is called the "guidance provision" in the bill, which fell in the range of the blue pencil, beginning "for the guidance of the Attorney-General," and ending "nor shall any warrants be issued, nor obligations incurred in excess of the amounts herein appropriated," could not, unless the whole bill failed and was vetoed, suffer destruction at the Governor's hands. In other words, that that was legislation, and if it should be held that his veto was effective to strike down any one of the amounts of $41,580.00, that it must be limited to that single item and could have none other or different effect. Now, if this is true, then the language in the guidance clause is absolutely at variance with the suggestion of an effective veto of one of the supposed items of $41,580.00. By the terms of this guidance clause, the Attorney-General is authorized to spend each year in payment of his own salary and that of assistants, clerk hire, for porter and his postage, telegraph, express, typewriters, and contingent expenses, the sum of $26,730.00, making for the two years, the sum of $53,460.00, a sum, exceeding the amount, which under this construction, would be left, of $11,960.00. So that if we permit the guidance clause to remain, as we all agree it must remain, there is an irreconcilable conflict and repugnancy between the expenditures authorized by it, and the sum of $41,580.00, which, if the veto is sustained, would be left available for the Attorney-General. If the Chief Justice and myself are correct in the conclusion that no portion of the $41,580.00, authorized to be spent for the first year can be made available for the second year, then we have the condition that for the year beginning September 1, 1912, and ending August 31, 1913, the Attorney-General will be without money for the payment of his salary, without money to pay a single assistant, buy a postage stamp or send a telegram, and this great department of our State Government left absolutely bankrupt. Further, it must be remembered that the bill provides that "no deficiencies shall be created, nor shall any warrants be issued, nor obligations incurred in excess of the amounts herein provided for." If the veto message was silent we would not feel justified in assuming that the Governor intended that the Attorney-General should be without any money for the whole of the second year, but an inspection of the Governor's message expressly refutes any such purpose on his part. Subdivision 2 of the veto is to this effect: "The item on page 30 of $41,580.00 for the fiscal year ending August 31, 1913, is objected to and disapproved. The remaining item of $41,580.00 as appropriated, is available for use until exhausted and may be applied during both the fiscal years ending August 31, 1912, and August 31, 1913." This last sentence makes it perfectly obvious, and removes the contention beyond the domain of doubt, that the Governor did not intend that the Attorney-General's department should be without funds for the second year. He says in the next succeeding sentence "if said sum of $41,-580.00 is not sufficient for both of said years any additional amount actually needed for the efficient administration of the Attorney-General's office can be had by a deficiency allowance when the same is ascertained to be necessary." It is clear that, if no appropriation at

all was made for the year 1913, that, at least in respect to an office
not provided for in the Constitution, there could be, in the light of the
entire bill, no deficiency warrant allowed. And it is equally clear that
when the veto message was written the Governor was under the im-
pression that what he terms the "item of $41,580.00," not obliterated,
would be available for the years 1912 and 1913. For the same reason
that we have held that the elimination of the words "the appropriation
of $83,681.00," did not have the effect to conclusively fix the inten-
tion of the Governor to veto the entire appropriation, we are justified
in holding that since the guidance clause of the enactment is out of
harmony and repugnant to the sum which the message leaves remaining
and since this is attempted to be appropriated for two years, that there
is such irreconcilable repugnancy and obscurity in the message that it
does not evidence an intent to deny the department financial aid for
1913, but is substantially meaningless, ineffective and is no veto at all,
because it must seem clear, in view of the whole message, that the
item of $41,580.00 for the second year would not have been eliminated,
except in the belief that the same sum set down under the year 1912,
would be available for both years.

An effort was made in argument to sustain the Governor on the
theory that under the Constitution he has the right to reduce any part
of an item. To this contention and claim, we can never give our as-
sent. If this were conceded, then it would be within the power of the
Governor to reduce any appropriation, where the amount sought to be
appropriated, was not fixed in the Constitution. It would authorize,
in respect to the Health Department, to the Controller's Department,
our educational institutions, our eleemosynary institutions and every
department of the State Government, the Governor—when the Legis-
lature had properly passed on the matter and probably adjourned—
might reduce, and tear down the appropriation made for the adminis-
tration of the affairs of the State in such a way as to beggar and bank-
rupt all of them and to deny the representatives of the people of the
State—the Legislature duly assembled—any authority or participation
whatever in the money mills of the commonwealth. Such a proposi-
tion involves such intolerable tyranny and hurtful usurpation as not
to be entertained for one moment. Nor, it should be said, was the ac-
tion of the Governor based on this theory, nor does he seem to enter-
tain this belief. It may seem difficult to so interpret the message as to
leave the result indicated above. We may assume that the message
was prepared in the closing hours of the Legislature in the midst of
great haste and urgency, and what we have said is in no sense a per-
sonal criticism of it. We have rather sought, in the light of the Gov-
ernor's position, considering the restraints imposed on him by law,
having reference to what he must have intended to do, to find such a
construction of it as will conform it to law and give it effect. We,
therefore, take what seems to be the safe ground, that since he could
not make the appropriation of $41,580.00 intended for the first year,
available for both years, that he will not be held to beggar and bank-
rupt the department for the last year. We also conclude, in view of
the language of the entire message, that, although he says that he has
vetoed the lump sum of $83,160.00, that in view of other parts of his

message, we will not give this a literal meaning to do which, would produce consequences never intended by the Governor and which could not but be deplored by him. And for a like reason it seems clear that the Governor's veto can not be sustained on the view or theory that he was merely vetoing an appropriation for one year. His own language is totally at variance with this assumption, for that, as stated above, he says that the item of $41,580.00 "is left subject to the use of the Attorney-General for the maintenance of his department for the two fiscal years named, any portion of which can be used under the language of the bill for any purpose in carrying on the duties of his office." Attention was called, in argument, however, and it is not without some weight, that in the recapitulation of the appropriation bill the clause "sum appropriated, $83,160.00," is presented in equal sums of $41,580.00 each, under the two years 1912 and 1913. But this is not a sufficient reason, or, as we believe, a reason at all, why the obvious intent of the Legislature should be disregarded. The mere position of the figures can cut but little, if any, figure and if this is to control, then the veto message of the Governor is in irreconcilable conflict with the appropriation bill as finally acted on by him, because an inspection of same discloses that the item $41,580.00 appears under the words "1912" and nothing appears available for the year ending 1913. It may be assumed that as a matter of convenience in the original draft of the bill, following a long custom and the rule that seems to have been applied to other departments, the Legislature from habit made this division, or it may have been made with a view of indicating the sum to be taxed for each of the fiscal years, but if it is to be given effect, as determining whether there was one item or more than one item, that is, a specific appropriation for the two several years, then on the same reasoning, it is utterly out of harmony with the Governor's veto, and if the placing of the sum of $41,580.00 under 1912, is to be given conclusive effect, then it must follow that there is no appropriation available for 1913. We have examined carefully the authorities cited by counsel, and, especially the cases of Porter v. Hughes, 4 Ariz., 1, 32 Pac., 165; Commonwealth v. Barnett, 199 Pa., 161, 55 L. R. A., 882; State of Miss. v. Holder, 76 Miss., 158, and Regents of the State of Oklahoma v. Trapp, 113 Pac., 910. The only case at all in point is the one last named. That case is quite similar to this. In the first clause of the appropriation bill we find the following language: "There is hereby appropriated out of the State Treasury the sum of two hundred eighty-five thousand, eight hundred and twenty-three hundredths dollars, or so much thereof as may be necessary, for the support and maintenance of the State University at Norman for the biennial period, beginning July 1, 1909, and ending June 30, 1911; and for other and miscellaneous purposes, and the State Auditor shall draw warrants upon the State Treasurer for such portion thereof as may be found to be due upon auditing the respective claims in favor of the person or persons to whom such claims are allowed; provided, that all claims and accounts against the State shall be sworn to as true and correct accounts before being audited." Section 2 of the Act then says: "The appropriation for the State University at Norman shall be apportioned as follows: "Then follows about fifty different items for the

two years, including the salary of the president, thirty-four professors, many associate professors, for freight, advertising, drayage, apparatus and supplies for the departments of botany, bacteriology, etc., dean of women, furniture and equipments for office, of reception room and parlors and all such miscellaneous items generally, as would ordinarily pertain to a university. Some of these items the Governor undertook to reduce and in passing on the validity of this veto, the Supreme Court of Oklahoma said: "It will be observed that section 1 appropriates the sum of $285,810.23 for the support and maintenance of the State University for the period mentioned therein. This, in our opinion, is the first and only item of appropriation contained in the Act." The Constitution of that State, unlike the Constitution of our State, required the bill to be approved by the Governor before it could become a law and that he had attempted to approve the bill in part and disapprove it in part. It was, therefore, held that "since he was without authority thus to approve the bill his sanction of part of the bill was ineffectual to give those parts the force of law." While it may be said that it was unnecessary for the court, in that case, to have adjudged whether or not the sum of $285,810.23 was the first and only item of appropriation contained in the Act, yet it is not without weight here. Again, the true test of the authority of the Governor disapproving parts of the bill is laid down in the case of the State v. Holder, 76 Miss., 158, "The true meaning of section 73 is that an appropriation bill made of several parts—that is, distinct appropriations, different, separable, each complete without the others, which may be taken from the bill without affecting the others, which may be separated into different parts complete in themselves—may be approved and become law in accordance with the legislative will, while others of like character may be disapproved and put before the Legislature again, disassociated from the other appropriations. To allow a single bill, entire, inseparable, relating to the one thing, containing several provisions, all complimentary of each other and constituting one whole, to be picked to pieces, and some of the pieces approved and others vetoed, is to divide the indivisible, to make one of several, to distort and pervert legislative action, and by veto, make a two-thirds vote necessary to preserve what a majority passed, allowable as to the entire bill, but inapplicable to a unit composed of divers complimentary parts, the whole passed because of each."

We have therefore these conclusions well established, supported by authority and sustained by reason:

1. That the entire appropriation was not vetoed.

2. That the provisions of law enacted by the Legislature governing the expenditure of the sum appropriated, referred to as the guidance clause, survived the Governor's veto, notwithstanding by its terms it was included therein.

3. Further it must seem obvious and can not be made the subject of fair debate, that if the remaining item (on the assumption that there were two items as that term is understood and defined by law) of $41,580.00, can, as attempted to be done as the fruit of the Executive blue pencil, be made available for the general support of the Attorney-General's department for the two years ending August 31, 1912 and

August 31, 1913, then we have legislation in this State by Executive warrant and a substitution thereof for legislation passed by the representatives of the people, and distinctly at variance with it.

4. If the veto is construed as leaving provision for both years, in the sum of $41,580.00, then such provision is repugnant to the guidance clause, which provides for the expenditure, within the discretion of the Attorney-General, of the sum of $53,460.00 for the two years, for his own salary, salaries of assistants, stenographic help, porter and miscellaneous expenses of his office, leaving out of view the considerable sum which the Legislature evidently thought necessary for the prosecution of trusts and other important litigation.

5. Again, it seems a necessary deduction from what is stated above that the Governor when he attempted to make the sum of $41,580.00 available for both years, was under the impression and acted in the belief that he could and had stricken from the bill the guidance clause above referred to, for the reason, among others, that he did mechanically and actually do so, and for the further reason, that it required both that such clause be stricken from the Act, as well as the words, "the sum of Eighty-Three Thousand and One Hundred and Sixty ($83,160.00) Dollars," to make his attempted act effective. This, as we have seen, made a wholly different appropriation from that made by the Legislature. The Legislature had enacted that the sum of $83,-160.00 should be appropriated and has thereby declared that in their judgment such sum was needed for the two years. The Governor, by striking out, and that in the middle of a sentence, the words "the sum of Eighty-Three Thousand and One Hundred and Sixty ($83,160.00) Dollars," and the figures, under the words, "For the years ending August 31, 1913," $41,580.00, made the bill carry an appropriation of the sum of $41,580.00 (which was left under the words at the top of the page "For the year ending August 31, 1912) for the two years. This he could not, under the law, do and for these irrefutable and controlling reasons (a) If the sum of $83,160.00 was a single item, then his veto of same, if effective, killed the entire appropriation; (b) if the sums of $41,580.00 and $41,580.00 were two items, then there was a legislative appropriation of the item left untouched and unmarked of $41,580.00 for the year ending August 31, 1912, whereas, if the veto can be sustained, he uses part of the language of the Legislature which had appropriated $83,160.00 and makes it carry, as available for two years, what under the two item theory was by the Legislature exclusively devoted to the single year ending August 31, 1912. It can not, we think, be doubted that as the bill passed the Legislature that under the two item theory, the sum of $41,580.00 for the year ending August 31, 1912, and $41,580.00 for the year ending August 31, 1913, were to be treated and were by the Legislature treated as two *separate* and *several* items and that they each constituted and were by the Legislature intended to constitute, specific appropriations for the respective years to which they relate and that the amount appropriated for the first year would not be available for the second year. Therefore, when the bill as passed by the Legislature provided "there is hereby appropriated the sum of Eighty-Three Thousand and One Hundred and Sixty ($83,160.00) Dollars to be expended during the two fiscal years

ending August 31, 1912, and August 31, 1913" and the Governor struck out the amount last named so as to change the entire meaning and purport of the appropriation and make it read in substance that there is hereby appropriated for the two fiscal years ending August 31, 1912 and August 31, 1913, $41,580.00, he thereby, if his veto is sustained, and said sum be made available for the two years, enacted into law that to which the Legislature had never given their assent and made a law which they had never passed and to permit the Executive, by veto, to thus change the wording and meaning of the law as passed by the Legislature, would give to the Governor the power to legislate without the consent of the Legislature ever having even considered such a measure. The unwisdom, of sustaining such a view should be apparent. If in any given case an appropriation is deemed extravagant or not needed at all, the Governor may properly and indeed in a proper case should intervene by the exercise of his veto power. In such a case he may assume the responsibility, if the Legislature has adjourned, of not having any appropriation, or may recall them to again consider of such appropriation. But in the instant case the effect of the Governor's action, on the assumption that there are two items, is to not only enact a law, but one which tested by the legislative declaration, contained in the guidance clause, is worse than no law at all. The sum which the Governor leaves, even if it could lawfully be used for both years, would be more than consumed in salaries and other expenses which the Legislature deemed essential to the welfare of the State, and which our united opinion saves from Executive disapproval and leaves the Attorney-General not one cent to secure evidence which might be vital to the public interest, not a penny to secure special counsel, howsoever badly needed, in important trust prosecutions, not a sou for use in the defense of or in suits to protect the State's interest in respect to her public domain and not a kopeck to enforce the liquor and other similar laws of this State. Such a result may not follow, but from the sum allowed by the Legislature was evidently in their mind.

If these propositions are sound, and crediting the statement of the Governor that he meant to leave provisions in the bill for both years, we have logically and inevitably the conclusion that he had undertaken to pass a law by veto, which he could not under the Constitution do, and that his veto was and is as ineffective as if it had never been filed or had been filed too late.

Under any view of the case taken by any member of the court, the relator is entitled to a preemptory writ of mandamus. If it should be held that the effect of the veto message of the Governor was to leave the appropriation untouched, this result follows. If the two sums of $41,580.00 each are to be treated as separate and severable items and that one of them was vetoed, yet, under the conceded facts in this case, this appropriation is more than ample to pay relator's claim and he is obviously entitled to his writ. In a matter of such great difficulty and doubt, it seems to us that the Comptroller was acting with proper caution in seeking a judicial construction, before recognizing any appropriation as available, and since his refusal to grant the warrant was in no sense willful or contumacious, we do not think that the cost of this

proceeding should be made a personal charge against him.  This rule was applied in the recent case of Minor v. McDonald, and while not stated in detail, it was on the ground that the officer charged by law with the custody of an estate, fund or manuscript, where his refusal to pay the one or deliver to another was in good faith and for apparently good reason, that he should not be held individually responsible for the cost of the proceedings.  As stated, in any event, relator is entitled to his preemptory writ of mandamus which is here directed to be issued with the cost of the proceedings chargeable against him.

Opinion filed November 4, 1911.

### ON MOTION FOR REHEARING.

MR. JUSTICE RAMSEY.—I concur in the action of the court in overruling the motion for rehearing.  I also fully concur, in view of the opinion of the majority of the court, that the question as to whether the appropriation for the first year may be used or become available for the second year is not before the court, and that a decision of that question is not called for and, holding their views, ought not now to be decided.

However, it should, in fairness be stated, and my associates authorize me to say that in this they fully concur, that, with my view and based as it is on the reasoning which led me to the conclusion to which I arrived, it was in no sense improper, but authorized, for me to express the opinion that no part of the appropriation for the year ending August 31, 1912, can be used for the year ending August 31, 1913. It is, too, manifest to my mind, that the provisions on page 62 of the Acts, Special Session, 1911, to this effect:  "Provided, that any portion of the appropriations made herein for the year ending August 31, 1911, for maintenance and support, the erection, remodeling or equipment, for repairs of buildings or for any institution of this State for which appropriations have been made herein which remain unexpended at the end of said fiscal year, shall be available, and may be used for the year ending August 31, 1913," so far from authorizing such use, by necessary implication forbid it.  Such a provision first appeared in our laws in 1909, and was intended, as the language expressly says, to be limited to appropriations for constructions of buildings and the support of certain institutions.  The bill itself speaks of institutions and the meaning of the word is well understood.  The bill itself refers to and names the Attorney-General's department as a department.  It scarcely needs to be stated that if it had been intended to make this provision apply generally it could and would have been done in one line and in respect to *all* appropriations.  The inclusion of these special matters, buildings and institutions, is to my mind convincing evidence that this provision was not to apply to any other appropriation.  As to the other questions it seems unnecessary for me to say more.

Opinion filed November 22, 1911.